UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES E. McCARTNEY,

    Petitioner,

vs.

ROBERT AYERS, Warden,

    Respondent.
                                      /

No. C 06-5198 PJH (PR)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner, a California prisoner currently incarcerated at San Quentin State Prison, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the January 2006 decision by the Board of Parole Hearings ("Board") finding petitioner unsuitable for parole. The court ordered respondent[1] to show cause why the writ should not be granted. This matter is now before the court for consideration on the merits of the habeas petition. For the reasons set forth below, the petition is denied.

## BACKGROUND

The Board reviewed the correctional counselor's January 2006 evaluation report which summarized the commitment offense as follows:

> On December 11, 1978, at approximately 2:38 A.M. an officer of the Corona Police Department responded to a Shell Station in the city of Corona, California with regards to the discovery of the body of a female identified as Kathy Marie McCartney. Subsequent investigation revealed that the 22-year-old victim had died as the result of fatal gunshot wounds to the chest area. A subsequent interview of Ms. Sue Windsor revealed that the victim's ex-husband (McCartney) had made an appearance at the victim's apartment at approximately 12:30 A.M. The witness indicated that (McCartney) had remained at the victim's residence for approximately five

---

[1] The proper named respondent in this action is Robert Ayers, the Warden at the San Quentin State Prison, where petitioner is incarcerated. *Stanley v. Cal. Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994); Rule 2(a), 28 U.S.C. § 2254. Accordingly, the clerk shall terminate ORNOSKI and substitute ROBERT AYERS as the proper respondent.

> minutes. Apparently, the victim had confided in Ms. Windsor that (McCartney) was in some type of serious trouble and, therefore, requested that the victim meet him at a gas station on the corner, near her residence. Ms. Windsor stated that the victim was responsive to the request of (McCartney) and did in fact leave the residence to join him at approximately 1:30 A.M. Supportive documents indicate that (McCartney) admitted to an investigation officer that he had been in the company of his ex-wife on the day of the instant offense. McCartney stated that he and his wife discussed his dissatisfaction of a court ordered property settlement. According to McCartney, he concluded his discussion with the victim and subsequently departed for Modesto in the company of his brother-in-law, Steven Hammond. Supporting documents indicate that Steven Hammond was subsequently arrested on January 23, 1979, at which time he confessed to his involvement in the commitment offense.
>
> During the course of his confession, Hammond subsequently implicated (McCartney) in the perpetration of this offense by stating that McCartney lured the victim to the scene of the commitment offense and subsequently shot her with a .22 caliber revolver.

Answer Ex. 7 at 1 (Life Prisoner Evaluation Report, prepared for January 2006 Calendar) (citation omitted).

On September 20, 1979, a jury of the Riverside County Superior Court convicted petitioner of first degree murder with personal use of a firearm. Petitioner was sentenced to twenty-five years to life, plus a two-year firearm enhancement which was stayed.

On January 12, 2006, petitioner, represented by counsel, appeared for his eighth parole hearing before the Board, which denied him parole. Petitioner filed state habeas petitions in the superior court and court of appeal, which denied relief. Answer Ex. 8. Petitioner filed a petition for review in the state supreme court, which denied review. Answer Ex. 9.

On August 2, 2006, petitioner filed a petition for a writ of habeas corpus in the District Court for the Central District of California, which transferred the petition to this court. On April 5, 2007, the court ordered respondent to show cause why a writ of habeas corpus should not be issued. Respondent has filed an answer, and petitioner has filed a traverse. Respondent does not dispute that the petition is timely and presents claims that were exhausted in state court. The petition is submitted for a decision on the merits.

2

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of a state court. *See Ylst v.*

3

*Nunnemaker*, 501 U.S. 797, 801-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001).  Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal court conducts "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law.  *See Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

Petitioner alleges that (1) his due process rights were denied when on January 12, 2006, the Board of Parole Hearings denied him parole based on the unchanging circumstances of his crime; and (2) the denial of parole violated due process because there was not "some evidence" to support the denial and parole was only denied because the Board has a "no parole" policy.  These claims do not merit habeas relief.

**I.    Due Process in Parole Suitability Determinations**

   **A.    Some Evidence Standard of Judicial Review**

The Ninth Circuit has determined that a California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings.  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (citing *Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979)).  *See also Irons v. Carey*, 505 F.3d 846, 851 (9th Cir.), *reh'g and reh'g en banc denied*, 506 F.3d 951 (9th Cir. 2007); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir. 2006), *reh'g and reh'g en banc denied*, No. 05-16455 (9th Cir. Feb. 13, 2007); *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003) (finding initial refusal to set parole date for prisoner with fifteen-to-life sentence implicated prisoner's liberty interest).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  *Sass*, 461 F.3d at 1128-29 (adopting some evidence

standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)).  *See also Irons*, 505 F.3d at 851.  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board.  *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

Respondent contends that an inmate is entitled to only minimal protections to satisfy due process in a parole proceeding.  Citing *Greenholtz*, respondent contends that due process in state parole procedures is satisfied merely if they afford the inmate an opportunity to be heard and a decision informing him why he did not qualify for parole release.  The Ninth Circuit, however, has held that requiring less than the some evidence standard "would violate clearly established federal law because it would mean that a state could interfere with a liberty interest - that in parole - without support or in an otherwise arbitrary manner."  *Sass*, 461 F.3d at 1129.  Thus, the some evidence standard of *Superintendent v. Hill* is clearly established law in the context of parole denial for purposes of federal habeas review.  *Ibid.*

**B.     Some Evidence to Support Board's Unsuitability Determination**

First, petitioner contends that the Board improperly relied on the circumstances of the offense to find petitioner unsuitable for parole.  Second, petitioner contends that his due process rights were violated because Board's decision was not supported by some evidence, and that he was denied parole pursuant to a "no-parole" policy.  In assessing whether the Board's denial of parole was supported by some evidence, the court's "analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state."  *Irons*, 505 F.3d at 851 (citing *Biggs*, 334 F.3d at 915).  "Accordingly, here we must look to California law to determine the findings that are

necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [petitioner's] case constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454, 105 S.Ct. 2768." *Ibid.* Under California law, "[t]he Board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal. Code. Regs., tit.15 § 2402(c)-(d)." *Ibid.*

Title fifteen, section 2402, of the California Code of Regulations sets forth the criteria for determining whether an inmate is suitable for release on parole. The circumstances tending to show that a prisoner is unsuitable include the following: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner;" (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others;" (4) commission of "sadistic sexual offenses;" (5) "a lengthy history of severe mental problems related to the offense;" and (6) "serious misconduct in prison or jail." Cal. Code. Regs., tit. 15 § 2402(c). The circumstances tending to show that a prisoner is suitable for parole include the following: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner suffered from Battered Woman Syndrome at the time of committing the crime; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner's present age reduces the risk of recidivism; (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release;" and (9) institutional activities "indicate an enhanced ability to function within the law upon release." Cal. Code. Regs., tit. 15 § 2402(d).

The Board concluded that petitioner posed an unreasonable risk of danger to society and a threat to public safety if released from prison based on the following factors: (1) the commitment offense was carried out in a dispassionate and calculated manner; (2)

6

1 petitioner's prior record indicated that he had failed to profit from society's previous
2 attempts to correct his criminality, including several juvenile parole terms for burglary; and
3 (3) petitioner did not demonstrate remorse or insight into the crime.

4     In order to determine whether the state court decisions were contrary to, or an
5 unreasonable application of, clearly established federal law, the court looks to the last
6 reasoned state court opinion, which is that of the superior court denying the state habeas
7 petition.  *See Shackleford*, 234 F.3d at 1079 n.2.  The superior court held that "[t]he record
8 before the Board of Prison Terms contained some evidence in support of the Board's
9 findings."  Answer Ex. 8.D.

    **1.     *Biggs* Challenge**

11     In his first claim for relief, petitioner contends that the Board's reliance on the
12 unchanging circumstances of the commitment offense twenty-seven years after the crime
13 violates due process because the commitment offense is no longer a reliable predictor of
14 petitioner's present and future dangerousness and does not satisfy the "some evidence"
15 standard.  The Ninth Circuit has suggested in dicta that sole reliance on the commitment
16 offense could raise "serious questions" about a state prisoner's liberty interest in parole.
17 *See Biggs*, 334 F.3d at 916-17.  *Biggs* upheld the initial denial of a parole release date
18 based solely on the nature of the crime and the prisoner's conduct before incarceration, but
19 cautioned that the value of the criminal offense fades over time as a predictor of parole
20 suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing
21 and assessment of the factors considered. . . .  A continued reliance in the future on an
22 unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs
23 contrary to the rehabilitative goals espoused by the prison system and could result in a due
24 process violation."  *Biggs*, 334 F.3d at 916-17.

25     As the Ninth Circuit noted in *Sass*, "*Biggs* affirmed a denial of parole after holding
26 that the circumstances of the offense and conduct prior to imprisonment constituted some
27 evidence to support the Parole Board's decision."  *Sass*, 461 F.3d at 1126 (citing *Biggs*,
28 334 F.3d at 917).  *See Biggs*, 334 F.3d at 916 ("As in the present instance, the parole

7

board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.").

The Ninth Circuit has expressed competing views on *Biggs* in subsequent panel decisions. In *Sass*, the Ninth Circuit held that evidence of Sass's prior offenses and the gravity of his commitment offenses constituted some evidence to support the Board's decision. 461 F.3d at 1129. Acknowledging the cautionary statements in *Biggs* concerning the potential for a due process violation by continued reliance in the future on immutable factors, *Sass* criticized that part of the opinion as improper speculation about how future parole hearings could proceed. *Ibid.*

In *Irons*, however, the Ninth Circuit echoed the concern raised in *Biggs* and expressed its "hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons*, 505 F.3d at 854 (citing *Biggs*, 334 F.3d at 917). Although the court determined that the Board's unsuitability finding was supported by "some evidence" that Irons's crime was especially cruel and callous, the *Irons* panel pointed out that in the cases holding that sole reliance on the commitment offense did not violate due process, namely, *Irons*, *Sass* and *Biggs*, "the decision was made before the inmate had served the minimum number of years required by his sentence." *Irons*, 505 F.3d at 852-54. *Irons* reasoned that due process was not violated when these prisoners were deemed unsuitable for parole "prior to the expiration of their minimum terms," even if they had demonstrated substantial evidence of rehabilitation. *Id.* at 854.

Recently, the Ninth Circuit held rehearing en banc in *Hayward v. Marshall*, 512 F.3d 536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008), which presented a state prisoner's due process habeas challenge to the denial of parole. The three-judge *Hayward* panel had concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole, and held that the governor's reversal of the

Board's grant of parole was not supported by some evidence and resulted in a due process violation. 512 F.3d at 546-47. The Ninth Circuit has not yet issued an en banc decision in *Hayward*; since holding rehearing en banc on June 24, 2008, the Ninth Circuit has ordered briefing on the questions, *inter alia*, whether the order granting rehearing en banc should be vacated and submission of the matter deferred, pending the California Supreme Court's decisions in *In re Lawrence*, No. S154018 and *In re Shaputis*, No. S155872, both of which cases were argued on June 4, 2008. *Hayward v. Marshall*, No. 06-55392, slip op. at 2 (9th Cir. July 10, 2008).

Unless or until the en banc court overrules the holdings of the earlier Ninth Circuit panel decisions in *Biggs*, *Sass* and *Irons*, these cases hold that California's parole scheme creates a federally protected liberty interest in parole and therefore a right to due process which is satisfied if some evidence supports the Board's parole suitability decision. *Sass*, 461 F.3d at 1128-29. These cases also hold that the Board may rely on immutable events, such as the nature of the conviction offense and pre-conviction criminality, to find that the prisoner is not currently suitable for parole, *Sass*, 461 F.3d at 1129. *Biggs* and *Irons* further suggest, however, that over time, the commitment offense and pre-conviction behavior become less reliable predictors of danger to society such that repeated denial of parole based solely on immutable events, regardless of the extent of rehabilitation during incarceration, could violate due process at some point after the prisoner serves the minimum term on his sentence. *See Irons*, 505 F.3d at 853-54.

Respondent contends that the court may not overturn the state court decision on the purported *Biggs* claim because *Biggs* is not clearly established federal law as determined by the Supreme Court. Assuming, without deciding, that under some circumstances, habeas relief may be granted under *Biggs* on a claim that parole denial based on the Board's sole reliance on the commitment offense and other unchanging factors does not satisfy the some evidence standard, the court finds that petitioner fails to establish the predicate for a *Biggs* claim because the Board did not rely solely on unchanging factors such as the commitment offense, but also considered petitioner's prior criminal history and

9

his lack of remorse and insight into the crime. Thus, the state courts' denial of relief was neither contrary to, nor an unreasonable application of, clearly established federal law.

### 2. Some Evidence of Unsuitability

#### a. Commitment Offense

With respect to the commitment offense, the Board determined that petitioner committed the crime in a dispassionate and calculated manner based on the evidence that the murder victim was petitioner's ex-wife who was twenty-two years old; the victim was shot four times in the torso and once in the head; the motive, i.e., anger over a divorce settlement, was trivial in relation to the offense; petitioner had previously arranged to have his ex-wife killed; and petitioner lured the victim from her home by calling her in the early morning hours and telling her to go to a gas station where she was shot and killed. Answer Ex. 2 at 64-65.

At the hearing, petitioner invoked his right not to discuss the crime, but the Board noted that the most recent evaluation report reflected his contention that although he was present during the commission of the murder, it was Mr. Hammond who murdered the victim. Answer Ex. 2 at 13 and Ex. 7 at 2 ("McCartney chooses not to discuss the crime in detail, stating that he has already described his role, as he believed it had been, a multitude of times in the past, and that he had nothing to add or change."). Petitioner testified about his background, stating that his mother passed away when he was eleven months old, and that he and his brother went into foster care when his father went to prison. Answer Ex. 2 at 14. Petitioner testified that he lived in a dozen different foster homes, and that he usually ran away from them. *Id.* at 14-15. In 1967, he was arrested for burglary at the age of fifteen and sent to the California Youth Authority ("CYA"). *Id.* at 13-14. While on parole from the CYA, petitioner violated parole in 1969 and then again in 1970. *Id.* at 14. At the age of eighteen, when he was released on parole from the CYA and no longer in foster care, he lived at the home of the victim's parents, whom he had met on a camping trip. *Id.* at 16-17.

1    Petitioner testified about the victim, Kathy McCartney, who underwent surgery as a
2 child to repair a minor deformity in her foot, and suffered gangrene in the hospital during
3 post-operative care, resulting in the loss of part of her foot. *Id.* at 18-19. According to the
4 mental health evaluation, petitioner married the victim in 1971 against her parents wishes
5 when she was fifteen and he was nineteen years old. Answer Ex. 6 at 2-3. In 1974, the
6 victim received $45,000 in a settlement related to her foot surgery. *Id.* at 3. Within a few
7 years, the couple suffered financial trouble after petitioner invested in a fraudulent
8 business. *Ibid.* Petitioner also reported that he became "possessive" of his wife because
9 she wanted to spend more time "partying" with her friends. *Ibid.* In January 1978, the
10 couple separated, and after initially agreeing to the terms of the divorce, the victim sought
11 custody of their two children. *Ibid.* Petitioner stated that he and the victim constantly
12 bickered from that time up to the time of her murder. *Ibid.* Petitioner testified that he has
13 lost contact with his two children, now grown. Answer Ex. 2 at 19.

14    The Board reviewed the probation officer's report ("POR"), which reflected a
15 statement to investigating officers by the victim's friend (Ms. Windsor) who reported that
16 petitioner came to the victim's apartment at about 12:30 a.m. on the night of the murder,
17 and that the victim stated that her ex-husband was in trouble and wanted to meet her at a
18 gas station. Answer Ex. 2 at 64-65; Answer Ex. 3 at 3. The witness also stated that the
19 victim told her that petitioner had presents for the victim's children. *Ibid.* The POR also
20 reflected petitioner's statement to an investigating officer that he had been with the victim
21 on the day she was murdered, that he had asked her to meet him at the gas station to
22 discuss a court-ordered property settlement, and that he and Mr. Hammond left the victim
23 at the gas station and drove back to Modesto. *Id.* at 3-4.

24    The POR reflected statements by Mr. Hammond following his arrest in January
25 1979:

26    At that time, [Hammond] confessed to his involvement in the killing.
He indicated that James McCartney had lured the victim to the
27    Lincoln Shell Station and then retrieved a .22 caliber revolver from
underneath the seat of a motorcycle in the rear area of the van, in
28    which they were riding. McCartney then killed the victim in the gas

11

> station parking lot and he stated that the victim screamed and then was shot repeatedly. Three months prior to this, Hammond had acted as an intermediary in a murder for hire, receiving $250.00 from McCartney and delivering it to another subject named "Bob", who was supposed to kill the victim. The subject failed to complete the contract. He also indicated that in November, 1978, he, Roberta Snover, the defendant's common-law wife, and James McCartney, went to Corona. During this time, McCartney had indicated he was going to execute the victim by bludgeoning her to death with a hammer. He had previously solicited Hammond to borrow his shotgun to complete the murder. It was noted, that Hammond denied pulling the trigger or having any other involvement in the murder . At one point he did admit that he had agreed to "spot" for McCartney during the execution.

Answer Ex. 3 at 3-4.

The POR also summarized statements by Mr. Hammond's wife, Patricia Leigh Hammond, which indicated that in the few months prior to the victim's murder, petitioner had sought her help to hire someone to kill the victim:

> She advised that in approximately August or September, 1978, while she was residing in Westwood, California, she spoke with the defendant via telephone. During this conversation, the defendant advised her "I want to get rid of Kathy". In response to this Patricia Hammond asked what he meant and he stated, "I just can't stand the bull shit I'm putting up with any longer.["] At this time, and during subsequent conversations, the defendant solicited her to attempt to locate somebody who would murder Kathy McCartney for money. He indicated he would be willing to pay $2,000.00 or $3,000.00 to have his ex-wife killed. Various other conversations took place during the following months, prior to December 11, 1978. During these times, the defendant solicited Patricia Hammond to arrange to have his ex-wife murdered for money. On December 9, 1978, she advised that the defendant came to her residence on the pretense of going fishing with her husband, Steve Hammond. At that time, he requested that Steve Hammond accompany him to murder Kathy McCartney. She advised her husband that he should take no part in anything having to do with the murder. At one point, the defendant advised her something in words to the effect, "Steven is going to be miles away when it happens. All I need him for is to be a lookout". Subsequent to this, both individuals left in the defendant's van. They returned to the residence during the morning hours of December 11, 1978. Upon arriving at home, [and] after James McCartney departed from the Hammond residence, Steve Hammond advised Patricia Hammond that McCartney had in fact killed Kathy McCartney. He further related that he had been in James McCartney's company when the murder had occurred, and that James McCartney had shot the victim repeatedly.

Answer Ex. 3 at 4-5.

12

1    A deputy district attorney from Riverside County District Attorney's Office appeared at the Board hearing to oppose parole and emphasized the premeditated, calculated nature of the offense, as evidenced by petitioner's two attempts at murder-for-hire, and his statement that he would kill the victim with a hammer. The district attorney also emphasized that petitioner lured the victim to a gas station in the middle of the night, and questioned the plausibility of petitioner's explanation that he met the victim at the gas station to discuss their divorce settlement. Answer Ex. 2 at 53-54.

Regarding motive, the district attorney argued that petitioner murdered his wife because he was controlling and possessive, as he himself admitted, and he was upset and angry that she had separated from him, as suggested by the evidence that petitioner drove from Modesto to Riverside County to murder his wife. *Id.* at 54. The district attorney also argued that petitioner has not shown insight into his life crime or remorse for the victim, noting that petitioner refuses to admit responsibility for the murder and blames Mr. Hammond, who had no motive for killing the victim. *Id.* at 55. The district attorney also noted that petitioner had an unstable social history and bad juvenile history. *Ibid.*

Petitioner points out that his psychological report concludes that his risk of violence to the community is low to low moderate. Answer Ex. 6 at 4. However, the mental health evaluator indicated that although petitioner has not been violent since his incarceration and posed a low risk of violence in a controlled setting, "it is difficult to assess his risk of dangerousness outside this setting. His history of violence places him at higher risk for future violence when compared with someone with no such history." *Ibid.* The evaluator also noted, "If Mr. McCartney did commit the commitment crime, then being in a stressful intimate relationship may increase the risk for violence." *Ibid.* The evaluation thus reflects the psychiatrist's opinion that even though the petitioner committed the crime nearly twenty-seven years earlier, the commitment offense still has some predictive value concerning his risk of violence if released from a controlled prison environment.

The record contains ample evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner, and that

13

the motive, anger over the divorce settlement, was trivial in relation to the offense.  The passage of twenty-seven years from the time of the commitment offense to the Board's unsuitability determination, did not render the nature of the commitment offense completely unreliable as an indicator of risk to public safety, particularly in light of the Board's further findings about petitioner's past criminal history and his lack of remorse, which were also supported by some evidence.

### b. Past Criminal History

The Board considered petitioner's prior juvenile record: at age fifteen, petitioner was sentenced to the CYA for burglary, and was returned to the CYA twice for parole violations involving burglary and absconding from foster placement.  Answer Ex. 2 at 13-14; Ex. 6 at 2.  Petitioner's only adult arrest and conviction was for the commitment offense.  The Board noted that throughout petitioner's incarceration, he received only one "115" serious rules violation report for falsifying documents in 1992, and has remained discipline-free since then.  Answer Ex. 2 at 32.

Prior to the commitment offense, petitioner did not have a history of violent offenses, and has had no record of violent behavior during incarceration.  The regulations provide, however, that the Board consider not only violent criminal history, but all relevant, reliable information, such as "past criminal history, including involvement in other criminal misconduct which is reliably documented."  Cal. Code Regs., tit. 15 § 2402(b).  The Board concluded from petitioner's juvenile record that he had failed to profit from previous attempts to correct his criminality, as evidenced by several juvenile parole terms and at least two parole violations between the ages of fifteen and eighteen.  The record contains some evidence to support the Board's determination that petitioner's prior record demonstrates that his release would pose an unreasonable risk to public safety.

### c. Lack of Remorse

The Board further determined that petitioner had not demonstrated remorse and insight into the crime, particularly because petitioner did not discuss the commitment offense, and the Board could not gauge his progress.  During the hearing, the Board

14

1 explained that it needed to measure petitioner's insight into the crime, even if he did not
2 admit that he shot the victim, such as explaining why he was he was even at the scene of
3 the crime when the victim was murdered.  Answer Ex. 2 at 43-44.  Because petitioner
4 exercised his right not to discuss the commitment offense pursuant to section 5011 of the
5 California Penal Code, the Board explained that it was at a disadvantage in assessing
6 petitioner's remorse.  *Ibid.*

7       The psychiatrist who evaluated petitioner noted that he declined to discuss the
8 details of the crime, stating that "it is too emotional for me to go over again."  Answer Ex. 6
9 at 2.  The psychiatrist also concluded, "Given Mr. McCartney's reluctance to discuss his life
10 crime, it is difficult to gauge his level of remorse or insight.  He does adhere to previous
11 accounts of his crime in which he states he was not responsible for his wife's death."  *Id.* at
12 5.

13       Under questioning by the district attorney, petitioner expressed how he felt about the
14 victim's death: "It was something that should never have happened.  Because of her death,
15 her children have suffered, her parents have suffered, and I'm sorry for that.  If I could
16 change places with her today, I would."  Answer Ex. 2 at 49.

17       Petitioner's attorney argued at the hearing that petitioner consistently maintained his
18 innocence about shooting the victim, naming Mr. Hammond as the actual shooter and
19 suggesting that Mr. Hammond's testimony against petitioner was not credible considering
20 his criminal history.  The Board considered Hammond's criminal record, including many
21 arrests for drug related offenses and his current incarceration for twenty years to life after
22 pleading guilty to burglary.  *Id.* at 56.  Hammond was also charged with second degree
23 murder connected to the burglary.  *Ibid.*

24       The record contains some evidence to support the Board's conclusion that petitioner
25 lacks remorse or sufficient insight into his role in the commitment offense.  From the record
26 available to the Board at the time of the hearing, petitioner expressed sorrow over the tragic
27 loss of his ex-wife's life and the impact on their children, but did not appear to take any
28 responsibility for her murder.  Even accepting petitioner's version of the crime, he has not

15

accounted for his role in luring his ex-wife from her apartment to the gas station in the middle of the night, or his failure to intervene when his companion, Mr. Hammond, purportedly shot her several times, or petitioner's failure to come forward to authorities after Mr. Hammond murdered his ex-wife, or petitioner's false statements to the investigating officer indicating that he and Mr. Hammond left the victim alive at the gas station when they drove back to Modesto. The record contains some evidence to support the Board's determination that petitioner's lack of remorse and insight demonstrates that his release would pose an unreasonable risk to public safety.

### 3. The Board's Unsuitability Determination

The Board considered factors favoring petitioner's suitability for parole: an exemplary prison disciplinary record, participation in self-help and therapy activities, vocational training and education during incarceration, viable parole plans for housing and employment, and laudatory work performance reports and letters from supervisors. The Board also considered his psychological report, which listed several factors likely to lower his risk of violence, including his age (fifty-three), his non-violent record during incarceration, and the absence of psychotic symptoms, antisocial behavior or substance abuse. The Board concluded, however, that petitioner posed an unreasonable risk of danger to society and a threat to public safety if released from prison based on the factors of unsuitability, discussed above.

Contrary to petitioner's claim that the Board's decision violated his right to due process, the record contains some evidence to support the Board's parole unsuitability determination. The state courts' denial of habeas relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## II. "No-Parole" Policy Claim

Petitioner further alleges that the Board denied him parole under a "no-parole" policy, denying him an impartial, unbiased review and depriving him of due process.

In the absence of a reasoned state court opinion addressing this habeas claim, the court conducts an independent review of the record which reveals that the Board provided

petitioner an opportunity to testify at the hearing and present documentary evidence of positive behavior during incarceration. The transcript reflects that the Board reviewed the evidence extensively and discussed it with petitioner and his attorney. Answer Ex. 2 at 10-63. In announcing its decision, the Board explained the facts it relied upon in finding him not suitable for parole. *Id.* at 64-69. These factors tend to negate the accusation of bias by demonstrating that the Board considered individualized facts and evidence in petitioner's case, and petitioner has not shown otherwise. Nor has petitioner made the showing necessary for an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). The state courts' rejection of this claim was not objectively unreasonable.

## CONCLUSION

Based on the foregoing, the petition for a writ of habeas corpus is DENIED. The clerk of the court shall terminate all pending motions, enter judgment for respondent, and close the file.

**IT IS SO ORDERED.**

Dated: July 28, 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.06\MCCARTNEY198.deny.wpd